**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **API AMERICAS INC., et al.,** | § | **Case No. 20-10239 (___)** |
| | § | |
| **Debtors.**[1] | § | **(Joint Administration Requested)** |
| _____ | § | |

**DECLARATION OF MITCHELL GENDEL IN SUPPORT
OF CHAPTER 11 FILING AND FIRST DAY PLEADINGS**

I, Mitchell Gendel, hereby declare under penalty of perjury that the following (this "Declaration") is true to the best of my knowledge, information and belief:

1.      I am the Chief Restructuring Officer of API Americas Inc. ("API Americas") and API (USA) Holdings Limited ("API Holdings" and collectively with API Americas, the "Debtors"), which are corporations incorporated under the laws of the state of Delaware.  In my capacity as Chief Restructuring Officer, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I have been a consultant for Steel Partners Limited Partnership since November 6, 2019, during which time I have worked on restructuring planning with regard to the Debtors.  In addition to API Americas, I have held senior level positions at MDC Partners, a global, publicly held advertising and communications company, and the Interpublic Group of Companies ("IPG").  Specifically, from 2004 until 2019, I served as General Counsel and Chief Administrative Officer for MDC Partners.  Prior to that, from 1999-2004, I served as the Vice President and Assistant General Counsel for IPG, a publicly traded advertising company.  In addition, I was an associate attorney in the Bankruptcy and Restructuring Department at the Mudge Rose law firm from 1991 to 1994.  I received my

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  API (USA) Holdings Limited (3934) and API Americas Inc. (9126).  The location of the Debtors' service address is: 3841 Greenway Circle, Lawrence, Kansas 66046.

Bachelor's degree in Psychology from Cornell University, and I earned by Juris Doctorate from Emory University School of Law in 1990.

2.      I am over the age of eighteen (18) and am authorized by the Debtors to submit this Declaration.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team, the Debtor's employees or the Debtors' advisors, my review of the relevant documents and information concerning the Debtors' operations, financial affairs and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would competently testify to the facts set forth in this Declaration.

3.      I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records, as well as the Debtors' restructuring efforts.  I submit this Declaration (a) to assist the Court and all parties in interest in understanding, among other things, the Debtors' operations, their corporate structures, and the circumstances that led to the commencement of these chapter 11 cases, and (b) in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") filed on February 2, 2020 ("Petition Date") and the relief that the Debtors request from the Court pursuant to the motions and applications described in this Declaration (collectively, "First Day Pleadings").

4.      To familiarize the Court with the Debtors and the relief sought in the First Day Pleadings filed in these chapter 11 cases, this Declaration is organized into four parts as follows:

- **Part I** provides an introduction to the Debtors and information on their history, corporate structure, and business operations;

- **Part II** provides an overview of the Debtors' capital structure;

- **Part III** provides a description of the circumstances leading to the commencement of these chapter 11 cases, including a description of the Debtors' prepetition solicitation and restructuring efforts; and

2

- **Part IV** provides an overview of the relief requested in the First Day Pleadings and sets forth the relevant facts in support of each.

I.   **DESCRIPTION OF THE DEBTORS' HISTORY, CORPORATE STRUCTURE AND BUSINESS OPERATIONS**

   **A.  The Corporate History and Corporate Structure of the Debtors**

5.   API Americas was originally founded as Dry Print in New Jersey. Re-branded in 1998, API Americas is currently headquartered in Lawrence, Kansas inside a 56,000 square foot facility with manufacturing capabilities. API Americas is made of up two divisions: the foils business unit and laminates business unit.

6.   Today, API Americas is a wholly-owned, direct subsidiary of API Holdings.  API Holdings is a wholly owned, direct subsidiary of non-debtor, API Overseas Holdings Limited. API Group Limited is an indirect parent that entered administration proceedings in the United Kingdom on January 31, 2020.

7.   API Americas is a manufacturer of foils, laminates, and holographic materials. Among other customers, API Americas provides packaging to companies in the premium drinks, confectionery, tobacco, perfume, personal care, cosmetics, and healthcare sectors.

8.   The Debtors' foils business provides products in a number of colors, patterns, and finishes.  The result is to add visual appeal to consumer products and their packaging.  The foil products are used on cartons and labels for premium products, and increasingly used on packaging for everyday consumer products.  The foils provide a clean "print" across a wide variety of substrates.  The foils business unit footprint is comprised of its headquarters and manufacturing facility in Lawrence, Kansas, as well as three leased distribution centers, located in Lawrence, Kansas, Santa Fe Springs, California and Levittown, Pennsylvania.

9.      The Debtors' laminates business provides laminated papers and board products. API Americas has a reputation as an established producer of paper and board laminates, which are used on fine spirits, tobacco, confectionery, and beauty brands.  Laminates have been valued by consumer brands because they offer a wide range of decorative effects, which allow products to stand out in a competitive retail environment.  The laminates business unit footprint has one central location located in Osgood, Indiana. This facility is owned by API Americas and is made up of 115,000 square feet which operates 24 hours a day, five days a week.

## II.      THE DEBTORS' CAPITAL STRUCTURE AND CREDIT FACILITY

10.      As of December 31, 2019, API Americas Inc. had total assets of approximately $37.3 million on a net book basis. The majority of its assets relate to accounts receivable, inventory, equipment, real property, cash, and cash equivalents. The company's current liabilities totaled approximately $5.8 million and long-term liabilities totaled approximately $47.3 million as of December 31, 2019.  As of the Petition Date, the outstanding amount owed by API Americas under the Credit Facility (defined below) is approximately $44.4 million in principal and approximately $0.01 million in accrued interest.

11.      As of December 31, 2019, API Holdings had total assets of $51.6 million (made up solely of investments in subsidiaries) and $2.9 million of liabilities (made up solely of intercompany liabilities).

12.      On November 14, 2017, SPH Group Holdings LLC, Steel Excel Inc., API Americas, Handy & Harman Group Ltd, and iGo, Inc. (collectively, "U.S. Borrowers"), Cedar 2015 Limited, as U.K. borrower ("U.K. Borrower" and collectively with U.S. Borrowers, "Borrowers"), the other Loan Parties as defined in the Credit Agreement (as defined below) party thereto ("Loan Parties"), each of the lenders from time to time party thereto ("Lenders"),

and PNC Bank, National Association ("PNC"), as administrative agent (in such capacity, "Administrative Agent," and together with the Lenders, "Prepetition Secured Parties"), entered into that certain Credit Agreement (as amended, modified, restated, amended and restated, and/or supplemented from time to time, "Credit Agreement" and, collectively with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, deeds, instruments, indemnities, indemnity letters, fee letters, assignments, charges, amendments, and any other agreements delivered pursuant thereto or in connection therewith, including the "Loan Documents" as such term is defined in the Credit Agreement, "Prepetition Loan Documents"), which provided the Borrowers with a $700 million credit facility ("Credit Facility").  The Credit Facility consists of: (a) a $500 million revolving credit facility ("RC Facility," and such loans thereunder, "Revolving Loans"), which includes a $50 million subfacility for the issuance of swing loans ("Swing Loans") and a $50 million subfacility for the issuance of letters of credit ("Letters of Credit"), and (b) a $200 million term loan facility ("Term Loan Facility," and such loans thereunder, "Term Loan").  All indebtedness, liabilities, and obligations under the Prepetition Loan Documents, specifically including all "Obligations" as defined in the Credit Agreement which includes the API Americas Direct Obligation (as defined below), are referred to herein as "Prepetition Secured Obligations."  Each of the Prepetition Loan Documents is valid, binding, and, subject to applicable bankruptcy law, enforceable against the Loan Parties, including the Debtors, party to any Prepetition Loan Documents.

13.    As of the Petition Date, API Americas owes approximately $44.4 million of principal amount of loans outstanding under the Credit Facility that is allocable to API Americas, comprised of approximately $44.4 million of principal amount of loans outstanding under the Revolving Facility, $0 of outstanding Swing Loans and $0 of Letters of Credit.

### III.    CIRCUMSTANCES LEADING TO BANKRUPTCY

14.    From 2016 to 2019, API Americas faced substantial deterioration in revenue and profitability as well as inconsistent quality and high scrap volumes.

15.    The Debtors have suffered from operating losses over the last couple of years, arising out of three main factors.  First, the Debtors have experienced a significant drop in demand for their products, due to unfavorable market dynamics and a shift toward more environmentally sustainable products.  In large part, the drop in demand is due to tobacco customers shifting to lower cost, alternative packaging and a substantial portion of the US market moving from merchant to captive.  The Debtors have also faced competitive pressures due to overcapacity in the industry.  The decreased demand has, in turn, led to decreased free cash flow and operating losses.

16.    Second, the Debtors have struggled to integrate different businesses after the consolidation of the Debtors' Rahway, New Jersey location into their Lawrence, Kansas facility. The consolidation of the Rahway facility resulted in a net investment of approximately $8 million, and was followed by unforeseen expenses due to the relocation and start-up inefficiencies.  As a result, the foils business unit declined by approximately $6 million from 2016 to 2019.

17.    Third, the acquisition of the Hazen Osgood Laminates Plant required API Americas to make a one-time investment in capital projects.  It too was followed by unforeseen expenditures and adverse market conditions.  As a result, the laminates business unit revenue declined by approximately $5 million from 2017 to 2019.

18.    As a result, the Debtors have encountered substantial deterioration of turnover and profitability across their business units.

19.     In addition, the manufacturing sector in general has faced economic headwinds in recent months.  On January 10, 2020, the New York Times reported that the Institute of Supply Management's manufacturing index for December 2019 reflected the fastest rate of contraction since June 2009.

20.     In December 2019, API Americas implemented direct and indirect headcount reductions for its foils business unit, reducing headcount from 112 to 90. The net annualized cost benefit for this initiative was approximately $2 million.

## IV.     OVERVIEW OF FIRST DAY RELIEF

21.     Contemporaneously with this Declaration, the Debtors have filed or expect to file a number of First Day Pleadings seeking orders granting various forms of relief intended to preserve value as the Debtors pursue a sale, stabilize the Debtors' business, facilitate the efficient administration of these chapter 11 cases, lessen the impact of the chapter 11 cases on the Debtors' day-to-day operations, and facilitate a successful chapter 11 Plan for the Debtors.  I believe that this Court's approval of the relief requested in the First Day Pleadings is essential to avoid immediate and irreparable harm to the Debtors and their estate, to provide the Debtors with an opportunity to continue to meet their obligations in the ordinary course of business, to provide for a smooth transition into chapter 11, and to provide for the efficient and swift administration of these chapter 11 cases.  A description of the relief requested, and the facts supporting each of the First Day Pleadings, is briefly set forth below.

36515706.1 02/02/2020

## EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS[2]

### Administrative and Procedural Motions

#### A.  Motion for Joint Administration

22.    The Debtors have filed several purely administrative or procedural First Day Pleadings, including a motion to jointly administer the Debtors' bankruptcy cases.  As in many large chapter 11 cases that are jointly administered, the Debtors' operations are integrated by nature, and each of the Debtors are liable for the Debtors' funded debt.  Joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

#### B.  Application to Retain Claims Agent

23.    The Debtors have filed an *Application for Entry of an Order Pursuant to 28 U.S.C. 156(c), Bankruptcy Code Section 105(a) and Local Rule 2002-1(f), Authorizing Appointment of Bankruptcy Management Solutions, Inc. D/B/A Stretto as Claims and Noticing Agent to the Debtors, Nunc Pro Tunc to the Petition Date.*  The Debtors request the approval of Debtors' retention and employment of Stretto as claims and noticing agent for the Debtors in lieu of the Clerk of the United States Bankruptcy Court for the District of Delaware.  The Debtors anticipate that there will be over a thousand entities to be noticed in these cases.  It is my understanding that, in view of the number of anticipated claimants and the complexity of the Debtors' businesses, the appointment of the Claims and Noticing Agent is both necessary and in the best interests of the Debtors' estates and their creditors because the Debtors will be relieved of the burdens associated with Claims and Noticing Services.

---

[2]  Capitalized terms used but not defined herein have the meanings given to them in the applicable First Day Motion.

36515706.1 02/02/2020

### C.  Motion for Authority to File Consolidated Creditor Matrix

24.     The Debtors have filed a *Motion for Entry of an Order (i) Authorizing the Debtors to File a Consolidated Creditor Matrix, and (ii) Authorizing the Debtors to File a Consolidated List of the Debtors' 20 Largest Unsecured Creditors.*  Therein, the Debtors request that the Court authorize the filing of a single consolidated list of their 20 largest general unsecured creditors and a consolidated creditor matrix.  I believe that such relief is appropriate under the circumstances for the efficient and orderly administration of these cases.  Also, a consolidated list of the Debtors' top 20 creditors is more reflective of the body of creditors that have the greatest stake in the outcome of these cases.

## Operational Motions

### D.  Motion for Approval of Payments to Critical Vendors

25.     By the *Motion of the Debtors* for *Entry of Interim and Final Orders Authorizing Payment of Prepetition Claims of Certain Critical Vendors* ("Trade Motion"), the Debtors request authority to pay in full, in their discretion and in the ordinary course of business, undisputed prepetition claims of vendors and other creditors that provide goods or services related to the Debtors' operations up to $250,000 in the interim and up to $500,000 following a final hearing on the Trade Motion.

26.     The immediate need to continue to provide consumers with uninterrupted access to their products and maximize the value of their assets for stakeholders are among the Debtors' foremost concerns.

27.     The Debtors have identified certain Critical Vendors that cannot be replaced within a reasonable amount of time and whose goods and services are necessary to ensure survival of the Debtors' business.

28.     To identify vendors to be paid pursuant to the relief requested in the Trade Motion, the Debtors, in consultation with their advisors, closely reviewed their accounts payable and prepetition vendor lists, and consulted with the employees most familiar with the Debtors' supply chains to identify those vendors that are most critical to the Debtors' operations.

29.     To preserve working capital and liquidity during the Chapter 11 Cases and ensure that the Debtors continue to receive vital goods and services, the Debtors propose to condition any payment on account of Critical Vendor Claims on entry into an agreement between the Debtors and the applicable Critical Vendor, under which such Critical Vendor would continue supplying goods and services to the Debtors on terms that are consistent with the historical trade terms between the parties (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability, and other applicable terms and programs), representing the most favorable trade terms to the Debtors by such Critical Vendor within the 365-day period preceding the Petition Date ("Customary Trade Terms").

30.     The Debtors further propose that, in the event the Debtors are making a payment pursuant to the Trade Motion, the Debtors will send a letter, substantially in the form attached to the Trade Motion as Exhibit C to the Trade Motion, to each of the Critical Vendors to which they are making such payment, along with a copy of the order granting the Trade Motion.  Such a letter, once agreed to and accepted by a Critical Vendor, shall be the agreement between the parties that governs their post-petition trade relationship, whether on Customary Trade Terms or on terms different from their Customary Trade Terms ("Trade Agreement").

31.     It is critical that the Debtors maintain strong relationships with their vendors and creditors given the nature of the Debtors' business.  Authority to pay the Trade Claims in the

ordinary course of business is necessary to minimize disruption to the Debtors' operations and allow for a seamless transition through chapter 11.

### E.  Motion for Approval of Certain Employee Wages and Benefits

32.      By the *Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay Prepetition Employee Wages, Salaries, and Other Compensation, and Reimbursable Expenses, and (II) Continue Employee Benefit Programs* ("Employee Motion"), the Debtors seek authorization to pay prepetition employee wages, benefits, payroll taxes and other amounts required to be paid in accordance with the Debtors' fiduciary duties.

33.      The Debtors employ approximately 125 employees (collectively, "Employees") across several states, all of whom are full-time Employees.  Approximately 90 Employees are compensated on an hourly basis, and approximately 35 are salaried.

34.      In addition to employee salaries, the Debtors are responsible to their Employees for: wages, overtime, and similar obligations ("Wage Obligations"); obligations on account of payroll deductions and payroll taxes ("Withholding Obligations"); expenses, travel-related expenses such as air travel, meal allowances, car mileage allowances, and business-related entertainment expenses ("Reimbursable Expenses"); health, insurance and benefits programs, including, among other programs, medical, prescription, supplemental medical, well-being, dental, and vision coverage plans, life and accident insurance, disability insurance, savings and spending account programs, and other employee benefit plans ("Health and Welfare Coverage and Benefits"); workers' compensation insurance for their Employees at the statutorily required level for each state in which they have Employees ("Workers' Compensation Program"); a workers' compensation policy with Everest National Insurance Company as part of the Workers' Compensation Program ("Workers' Compensation Insurance Policy"); a retirement savings plan

for the benefit of their Employees that satisfies the requirements of section 401(k) of the Internal Revenue Code ("401(k) Plan") and other retiree benefits; paid time off to certain eligible Employees ("Paid Leave Benefits"); provision of a car to each of approximately 5 executive and other eligible employees who, as a regular part of their responsibilities, must travel frequently ("Leased Car Program"); and, an alternative to the Leased Car Program, which provides eligible Employees—approximately five (5) of Debtors' Employees—who are required to travel frequently in the course of their employment but drive less than 10,000 miles on company business per year with a regular car allowance, ranging from approximately $500 to $750 per month ("Car Allowances"); and certain other benefits that the Debtors have provided in the ordinary course (each as defined herein, and collectively, "Employee Compensation and Benefits")

35.     The vast majority of employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.  Thus, employees will be exposed to significant financial hardships if the Debtors are not permitted to continue paying their compensation, providing benefits, and maintaining existing employee programs.

36.     The Debtors' employees perform a wide variety of functions critical to providing service and support to their customers and the administration of these chapter 11 cases.  The Employees' skill, knowledge, and understanding with respect to the Debtors' operations, customer relations, and infrastructure are essential to maintaining the Debtors' business operations and will be equally essential during this chapter 11 case.  Moreover, just as the Debtor depends on the Employees to operate their businesses, those individuals also depend on the Debtors.  In many instances, the Debtors' employees include highly trained personnel with specific technical skills and/or industry knowledge who are not easily replaced.  Without the

36515706.1 02/02/2020

continued, uninterrupted services of their employees, the Debtors' value-maximizing administration of these chapter 11 cases would be materially impaired.

37.     On average, the Debtors spend approximately $540,000.00 per month on Wage Obligations.  As of the Petition Date, the Debtors estimate that they owe approximately $165,000 on account of accrued Wage Obligations.  The Debtors do not owe Wage Obligations to any individual in excess of the statutory cap of $13,650 set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

38.     In the ordinary course of business, the Debtors pay their Employees on a biweekly calendar basis, in arrears, generally on Fridays.  The Debtors' first post-petition scheduled payroll date is February 14, 2020, which will compensate Employees for prepetition and post-petition services.  The Debtors utilize the services of ADP, LLC. ("ADP"), a third-party payroll administrator, to process their payroll and coordinate the remittance of withholding taxes and other obligations (as defined below).  From their KeyBank account described below, the Debtors remit two lump sum payments (one for laminates and one for foils) into an account specified by ADP, which ADP then uses to fund payroll.

39.     The Debtors' Withholding Obligations include pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed herein and federal, state, and local income taxes, as well as Social Security and Medicare taxes.  Because Withholding Obligations are incurred as a component of the Wage Obligations, the average monthly amount of Withholding Obligations and the amount of Withholding Obligations presently owed are included in the amounts set forth above with respect to Wage Obligations.  The Debtors respectfully request that the Court authorize the Debtors to continue to honor their Withholding

Obligations and to pay any prepetition claims with respect thereto in the ordinary course of business, subject to the limitations in the Interim Order.

40.    Reimbursable Expenses include, among other expenses, travel-related expenses such as air travel, meal allowances, car mileage allowances, and business-related entertainment expenses.  Employees who pay for their own Reimbursable Expenses up front apply for reimbursement of such expenses by submitting an expense report to the Debtors.  Once they have determined that the charges are for allowable reimbursable business expenses, the Debtors have typically reimbursed such Employees for any such expenses.

41.    In certain cases, however, Reimbursable Expenses are processed through a system based on use of the Debtors' corporate cards, which are provided by American Express ("Corporate Cards").  Under the Corporate Cards, Reimbursable Expenses that would otherwise be paid upfront by Employees and then reimbursed by the Debtors are instead charged directly to the Debtors' Corporate Card.  As of the Petition Date, the Debtors have issued 4 Corporate Cards to their Employees.

42.    The Debtors' inability to reimburse the Reimbursable Expenses could impose a hardship on the Employees where such individuals incurred obligations for the Debtors' benefit. Employees incurred the Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that such expenses would be reimbursed.

43.    During the 2019 calendar year, the Debtors incurred a monthly average of approximately $20,000 on account of the Reimbursable Expenses.  Additionally, as of the Petition Date, the Debtors estimate that they owe approximately $7,500 on account of Reimbursable Expenses.  The Debtors will not seek to pay any outstanding Reimbursable Expenses or fees related thereto in advance of the date they come due.  Accordingly, the Debtors

respectfully request that the Court authorize the Debtors to continue to honor their Reimbursable Expenses and to pay any prepetition claims with respect thereto in the ordinary course of business, subject to the limitations in the Interim Order.

44.     The Debtors have offered their Employees the ability to participate in a number of health, insurance and benefits programs, including, among other programs, medical, prescription, supplemental medical, well-being, dental, and vision coverage plans, life and accident insurance, disability insurance, savings and spending account programs, and other employee benefit plans (collectively, "Health and Welfare Coverage and Benefits"). The Health and Welfare Coverage and Benefits are, in each case, available to full-time Employees who are scheduled to work 30 or more hours per week ("Eligible Employees"). The Debtors also subsidize or continue to provide certain benefits to certain former Employees after their termination, retirement, or disability leave, including, without limitation, benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985.

45.     The Debtors' Health and Welfare Coverage and Benefits include:

a. **Medical and Prescription Coverage:** The Debtors provide, through their affiliate Steel Partners Holdings LP, a self-funded program in conjunction with carriers, UMR (as the Medical Third Party Administrator) and MaxorPlus (as the Prescription Benefit Manager). Eligible Employees have the option to opt out of medical coverage. Eligible Employees can choose from among two high-deductible health plans, each of which offers the added benefit of a Health Savings Account, and one Preferred Provider Organization Plan and a Flexible Spending Account (collectively with the other forms of coverage described in this paragraph, "Medical and Prescription Coverage"). On average, the Debtors cover 60% of the cost of premiums, while the Employees cover the remaining 40%. Spouses, children and legally recognized dependents are eligible dependents. Approximately 80% of Employees enroll in Medical and Prescription Coverage. The annual cost of the Medical and Prescription Coverage is approximately $1,032,000, all of which is paid to Steel Partners Holdings LP. As of the Petition Date, the Debtors estimate they owe approximately $120,000 on account of incurred but yet unpaid Medical and Prescription claims and administrative fees.

    b. **Life Insurance Coverage:** The Debtors provide, through their affiliate Steel Partners Holdings LP, basic life and accidental death and dismemberment insurance (at an amount calculated based on the lesser of $300,000 or 2 times the Employee's salary), short-term disability insurance to all Eligible Employees ("Life Insurance Coverage"), as well as long-term disability, supplemental, spouse, and child life products offered on a voluntary, Employee-paid basis, administered by Metlife.  The average annual cost of the Life Insurance Coverage is approximately $97,000 excluding voluntary products.   As of the Petition Date, the Debtors estimate they owe approximately $8,100 on account of unpaid Life Insurance Coverage.

    c. **Dental and Vision Insurance Coverage:** The Debtors provide, through their affiliate Handy & Harman, a self-insured dental plan provided by Delta Dental ("Dental Insurance Coverage") and a self-insured vision plan provided by VSP ("Vision Insurance Coverage").  70% of the dental premium is employer-paid and 0% of the vision premium is employer-paid.  The average annual cost of the Dental Insurance Coverage is approximately $80,000.  As of the Petition Date, the Debtors estimate they owe approximately $6,700 on account of unpaid Dental Insurance Coverage.  The average annual cost of the Vision Insurance Coverage is approximately $14,000.  As of the Petition Date, the Debtors estimate they owe approximately $1,200 on account of unpaid Vision Insurance Coverage.

    d. **Other Coverage:** Other voluntary, Employee-paid benefits are offered and administered by various providers, such as critical illness, accident coverage, and hospital indemnity insurance.

46.     During the 2019 calendar year, the Debtors have incurred a monthly average of approximately $102,000 on account of the Health and Welfare Coverage and Benefits.  Additionally, as of the Petition Date, the Debtors estimate they owe approximately $102,000 on account of unpaid Health and Welfare Coverage and Benefits.  As described above, failure to continue the Health and Welfare Coverage and Benefits could cause Employees to experience severe hardship and make it difficult to retain the workforce.   Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue to honor their Health and Welfare Coverage and Benefits and to pay any prepetition claims with respect thereto in the ordinary course of business, subject to the limitations in the Interim Order.

47.     The Employees who participate in certain of the Medical and Prescription Coverage may contribute a portion of their compensation into a health savings account ("HSA"), or, alternatively, may elect to receive access to a flexible spending account ("FSA"), each of which may be used for incidental medical expenses.  As of the Petition Date, the Debtors estimate that approximately $2,000 is owed on account of accrued but unpaid HSA and FSA obligations.

48.     The 401(k) Plan is administered by Fidelity and allows for automatic pre-tax salary deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.  The Debtors also match 100% of the Employees' contributions to the 401(k) Plan for the first 4% of each Employees' annual income that is contributed to the 401(k) Plan ("401(k) Matching Contributions").  The 401(k) Matching Contributions are made with each bi-weekly payroll.

49.     During the 2019 calendar year, the Debtors incurred approximately $175,000 on account of the 401(k) Matching Contributions.

50.     On January 30, 2020, Steel Excel Inc., the Debtors' affiliate, became the sponsor of the 401(k) Plan such that the Debtors are no longer charged with administering the plan.  The Debtors nevertheless remain obligated, for 401(k) Matching Contributions for their Employees, of which approximately $10,000 has accrued but is unpaid as of the Petition Date.  The Debtors respectfully request that the Court authorize the Debtors to continue to honor their 401(k) Matching Contributions and to pay any prepetition claims with respect thereto in the ordinary course of business, subject to the limitations in the Interim Order.

51.     The API Foils North America Pension Plan ("Pension Plan") is a single-employer defined benefit pension plan with approximately 126 participants.  The Pension Plan was only

open to Employees of the Debtors who were not members of a bargaining class.  Under the Pension Plan, benefits are vested upon retirement at age 65 with 5 years of plan participation (with options for early retirement, late retirement, termination benefits, and survivor annuity death benefits).  Benefits are paid as annuities or a single lump sum following termination of employment.  Pension Plan benefits for eligible Employees are based on years of service and employee pay.  The Pension Plan was closed for all new Employees on and after September 30, 2004 and frozen for all Employees as of the same date.

52.    Furthermore, until 2018, certain of the Debtors' Employees participated in the Teamsters Local 11 Pension Plan ("Teamsters Plan"), a multi-employer defined benefit plan.  In 2018, the Debtors withdrew from the Teamsters Plan.  As a result, the Debtors recorded approximately $5.2 million of expense in 2018, representing the estimated withdrawal liability under the terms of the Teamsters Plan's trust agreement with a twenty-year payment period beginning November 2018.  The Debtors made payments totaling $276,000 in 2019, and have paid a total of $23,000 to date in 2020.  The Debtors believe that no Teamsters Plan withdrawal liability payments are due and owing as of the Petition Date.

53.    On January 30, 2020, the Debtors transferred their rights and obligations under the Pension Plan, and, on January 31, 2020, the Debtors their obligations relating to the withdrawal liability payments under the Teamsters Plan, in each case, to Steel Excel Inc., their affiliate.  Because the Debtors are no longer obligated with respect to the Pension Plan and the Teamsters Plan, the Debtors are not seeking Court approval to pay any outstanding obligations related to the Pension Plan or the Teamsters Plan by this Motion

54.    The Debtors have, in the past, provided paid time off to certain eligible Employees as a benefit ("Paid Leave Benefits").  The Debtors' Paid Leave Benefits program

includes vacation, sick/personal days, jury duty (up to 5 days), bereavement leave (up to 3 days), military leave (up to 10 days), and holidays.  When an Employee elects to use Paid Leave Benefits, that Employee is paid his or her regular hourly or salaried rate.  In the case of Paid Leave Benefits related to vacation time, an Employee is only entitled to a prorated cash payment for unused Paid Leave Benefits in the event that such Employee is terminated from the Debtors' employment, subject to certain conditions.  Employees are not entitled to a cash payment of any kind for unused Paid Leave Benefits unrelated to vacation time.

55.    The Debtors also permit the Employees to take unpaid leaves of absence for family medical leaves and for other kinds of leave in excess of the number of days set forth in the Paid Leave Benefits (collectively, "Unpaid Leave").  The Employees are not entitled to cash payments for unused Unpaid Leave.

56.    As of the Petition Date, the Debtors have approximately $31,000 of accrued but unpaid Paid Leave Benefits, which the Debtors seek to honor in the ordinary course.  The Debtors believe that the continuation of Paid Leave and Unpaid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend, and the continuation of those programs will not create any material cash flow obligations beyond the Debtors' normal payroll obligations.  As a result, by the Employee Motion, the Debtors request that the Court authorize the Debtors to continue to pay amounts on account of Paid Leave Benefits if and when they come due in the ordinary course of business and to allow eligible Employees to use their Paid Leave Benefits and Unpaid Leave on a post-petition basis in the ordinary course of the Debtors' businesses, consistent with past practices, in each case, subject to the limitations in the Interim Order.

57.    Pursuant to the Leased Car Program, the Debtors make monthly payments on the vehicles for a period of approximately 4 years, and at the end of the payment period, the Debtors have certain obligations related to the leases.

58.    The Debtors' estimated monthly cost for the Leased Car Program is $3,200.  As of the Petition Date, the amount of unpaid liability based on the remaining months on the leases under the Leased Car Program is approximately $3,200.

59.    As an alternative to the Leased Car Program, the Debtors provide eligible Employees who are required to travel frequently in the course of their employment but drive less than 10,000 miles on company business per year with a regular car allowance, ranging from approximately $500 to $750 per month (the "Car Allowances").  Approximately 5 of the Debtors' Employees currently receive Car Allowances.  The Car Allowances are designed to cover the costs of gas, wear and tear, maintenance, and insurance for the Employees' personal vehicles, and are included in the Debtors' regular payrolls.

60.    On a monthly basis, the Debtors pay approximately $2,850 in Car Allowance expenses.  As of the Petition Date, the aggregate amount of outstanding and unpaid Car Allowance expenses is approximately $2,850.

61.    I believe that it is critical to continue to provide the Leased Car Program and pay the Car Allowances in the ordinary course in accordance with prepetition policies.

62.    In addition to the foregoing, the Debtors offer the Employees the opportunity to participate in a range of general, ancillary benefits, such as an employee assistance program, which offers confidential access to counseling, programs, and services funded by the Debtors needed to balance work and home life ("Additional Benefit Programs").  The aggregate cost of the Additional Benefit Programs is *de minimis.*

**F.  Motion for Approval of Payments to Certain Possessory Lienholders**

63.      By the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Lien Claimants, and (II) Granting Related Relief,* ("Lienholders Motion"), the Debtors seek entry of interim and final agreed orders authorizing, but not directing, Debtors to pay Lien Claims in an amount not to exceed $100,000.00 pursuant to the Interim Order, and in the aggregate, inclusive of amount paid pursuant to the Interim Order, an amount not to exceed $100,000.00 pursuant to the Final Order.

64.      The Debtors use and make payments to shippers, contractors, mechanics, laborers, warehousemen, and technical engineers (collectively, "Lien Claimants") that repair, maintain, equip, supply, transport, store products, and otherwise service necessary equipment and machinery.   As of the Petition Date, the Debtors estimate that they owe approximately $100,000.00 to Lien Claimants for prepetition labor, shipping, delivery, and other charges (collectively, "Lien Claims").

65.      The Debtors seek authority to pay the Lien Claims of the Lien Claimants who, under applicable law, have the potential to assert statutory liens against property of the Debtors if the Debtors fail to pay for services rendered before the Petition Date.  In order to ensure efficient operations, and safe and orderly working conditions at their operating locations, the Debtors at times hire third-party service providers to care for the processing facilities.   These services include, among others: (a) common carrier and freight transport, (b) construction and general contractor service, (c) equipment procurement, service, and repair, (d) mechanical work, and (e) storage.   If these costs are not paid, then there could be significant negative repercussions affecting the safety and operations of the businesses.   Any disruption in the flow of the aforementioned services, or shipping, would immediately effect on-time delivery and production

volume of products and byproducts and the safety and welfare of the Debtors' employees. Further, any disruption in the flow of services would cause the Debtors immediate and substantial economic harm and erode their ability to meet delivery and safety obligations.

66. Much of the production equipment in use by the Debtors is highly customized and industry specific, and the available pool of experienced Lien Claimants is therefore limited. Furthermore, the technical knowledge of the Debtors' engineers and information technology suppliers is unique to the packaging industry and, in many cases, specially tailored to the Debtors' businesses.

67. While the Debtors themselves employ on-site mechanics and engineers at certain of their properties, the Debtors cannot afford to employ sufficient mechanics to repair and maintain all of the specialized equipment the Debtors operate in all possible locations at which service might be required. Accordingly, the Debtors have service agreements or longstanding business relationships with third-party maintenance Lien Claimants and even individuals trained and licensed to provide maintenance services at the Debtors' various sites. The Debtors have, over the years, nurtured and developed their relationships with these Lien Claimants and have come to rely on the high-quality and priority service they receive. In addition, these Lien Claimants have developed in-depth knowledge of the mechanical and engineering requirements of the plants and/or other equipment. It is essential to the continuity of the Debtors' operations, and the preservation of value of the Debtors' estates, that the Debtors maintain their relationships with these Lien Claimants.

68. Because the Debtors are dependent on many third-party Lien Claimants, it is essential that the commencement of the Chapter 11 Cases not give any third party Lien Claimants reason or excuse to cease performing services.

### G. Motion for Approval of Proposed Adequate Protection to Utility Companies

69.     By the *Motion* of *the Debtors for Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief,* ("Utilities Motion"), the Debtors seek entry of interim and final agreed orders as follows:  (a) approving the Debtors' proposed adequate assurance of payment for future utility services, (b) prohibiting utility companies from altering, refusing, or discontinuing services, (c) approving the Debtors' proposed procedures for resolving Adequate Assurance Requests, and (d) granting related relief.  In addition, the Debtors request that this Court schedule a final hearing to consider approval of the Utilities Motion on a final basis.

70.     In connection with the operation of their businesses and management of their properties, the Debtors obtain utility services, as that term is used in section 366 of the Bankruptcy Code, including electricity, natural gas, telephone, sewage, telecommunications, waste removal, water, and other similar services (collectively, "Utility Services") from various utility companies (each, a "Utility," and collectively, the "Utilities").

71.     During the past twelve months, the Debtors paid an average of approximately $118,393 per month on account of Utility Services.  The Debtors pay Utility Services through their accounts payable system.  In addition, the Debtors pay various telecommunication vendors through their vendor accounts payable system and generally pay trash providers though their vendor accounts payable system.  The Debtors have also provided one of the Utilities with a cash deposit.  To the best of the Debtors' knowledge, there are few, if any, material defaults or

arrearages with respect to the Debtors' undisputed Utility Services invoices, other than payment interruptions that may be caused by the commencement of the Chapter 11 Cases.

72.     To provide adequate assurance to the Utilities as required under section 366(c) of the Bankruptcy Code, the Debtors propose to deposit into a segregated account for the benefit of the Utilities ("Utility Deposit Account") an amount equal to two weeks of Utility Service, calculated as a historical average over the past twelve months ("Adequate Assurance Deposit"). The aggregate amount of the proposed Adequate Assurance Deposit is approximately $55,250. The Adequate Assurance Deposit will be held by the Debtors in the Utility Deposit Account for the benefit of the Utilities on the Utilities List during the pendency of the Chapter 11 Cases.

73.     The Debtors will deposit the Adequate Assurance Deposit in the Utility Deposit Account within twenty calendar days of entry of the Interim Order.  The amount allocated for, and payable to, each Utility shall be equal to the amount set forth on the Utilities List as to each Utility or as otherwise agreed between the Debtors and each Utility.

74.     The portion of the Adequate Assurance Deposit attributable to each Utility (including any additional amount deposited upon request of any applicable Utility) shall be returned to the Debtors on the earlier of (i) reconciliation and payment by the Debtors of the Utility's final invoice in accordance with applicable non-bankruptcy law following the Debtors' termination of the Utility Services from such Utility, (ii) the closing of a sale of all or substantially all of the Debtors' assets, or (iii) the effective date of any chapter 11 plan confirmed in these Chapter 11 Cases.  Additionally, if the Debtors terminate and/or reduce any of the Utility Services provided by a Utility, the Debtors request that they immediately be permitted to reduce the Adequate Assurance Deposit to reflect the termination and/or reduction of such Utility Services; provided, that the Debtors shall have paid any such Utility in full for any outstanding

post-petition Utility Services with respect to the terminated or reduced Utility Services before reducing the Adequate Assurance Deposit.

75.     Given the cash reserves that will become available under the Cash Collateral Order (as defined below), I believe that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future Utility Services in the ordinary course of business, constitutes sufficient adequate assurance to each of the Utilities (collectively, the "Proposed Adequate Assurance").

76.     I believe that any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations. Such a result could potentially jeopardize the Debtors' ability to perform under their customer contracts and impair the Debtors' restructuring efforts and, ultimately, the value of the Debtors' business.  In my opinion, it is critical that Utility Services continue uninterrupted during the Chapter 11 Cases.

### H.  Motion for Use of Cash Collateral

77.     By the *Motion* of *the Debtors for Interim and Final Agreed Orders (i) Authorizing the Use of Cash Collateral, (ii) Granting Adequate Protection, (iii) Modifying the Automatic Stay; (iv) Scheduling a Final Hearing; and (v) Granting Related Relief* ("Cash Collateral Motion"), the Debtors seek entry of interim and final agreed orders authorizing the Debtors to use cash collateral of Prepetition Secured Parties.

78.     As described above, prior to the Petition Date, API Americas and the rest of the Loan Parties entered into the Credit Agreement for a $700 million Credit Facility with the Prepetition Secured Parties.  As of the Petition Date, there is approximately $44.4 million of principal amount of loans outstanding under the Credit Facility that is allocable to the Debtors,

comprised of approximately $44.4 million of principal amount of loans outstanding under the Revolving Facility, $0 of outstanding Swing Loans and $0 of Letters of Credit.

79.     The Credit Facility is structured to allow each of the Borrowers to borrow directly or through the Borrowing Agent (as defined in the Credit Agreement) Revolving Loans and the U.S. Borrowers are also obligated with respect to the Term Loan.  API Americas is the only Borrower that is also a Debtor, and API Holdings is the only Guarantor (as defined in the Credit Agreement) that is also a Debtor.

80.     As of the close of business on January 29, 2020, the Debtors were justly and lawfully indebted and liable under the Prepetition Loan Documents, without defense, counterclaim, reduction or offset of any kind, in the aggregate principal amount of not less than (A) $44,388,238.42 in respect of loans and other financial accommodations made by the Lenders comprised of the principal amount of loans outstanding under RC Facility advanced directly to API Americas ("API Americas Direct Obligation"), plus (B) as a co-obligor and Loan Party with respect to an aggregate amount of $232,202,382.00 with respect to Revolving Loans and the face amount of issued and outstanding Letters of Credit and Swing Loans advanced to, or issued for the benefit of, Borrowers other than API Americas and $190,000,000.00 with respect to the Term Loan, pursuant to, and in accordance with, the Credit Agreement and other Prepetition Loan Documents, plus accrued and unpaid interests, fees, costs and expenses (including counsel, financial advisors, consultants, accountants, to the extent applicable, chargeable or reimbursable under the Prepetition Loan Documents) with respect to each of the foregoing.

81.     Pursuant to and as more particularly described in the Prepetition Loan Documents, the Prepetition Secured Obligations are secured by, among other things, first priority liens on, security interests in, and assignments and pledges of (collectively, "Prepetition Liens"),

all of the Debtors' right, title, and interest in the Debtors' personal property (to the extent provided in and as more fully described in the Prepetition Loan Documents, "Prepetition Collateral"), subject to any other valid, perfected and unavoidable lien or security interest otherwise existing as of the Petition Date that is senior to the security interest of the Prepetition Secured Parties, to the extent such liens or security interests are valid, perfected and unavoidable liens or security interests existing as of the Petition Date and otherwise senior to the Prepetition Liens as of the Petition Date (collectively, "Prepetition Permitted Liens" and each a "Prepetition Permitted Lien").

82.    The Debtors require immediate access to liquidity to ensure that they are able to continue operating their businesses during these chapter 11 cases, preserve the value of their estates for the benefit of all parties in interest, and administer a value-maximizing chapter 11 process.  However, all or substantially all of the Debtors' cash is Cash Collateral, and, without prompt access to such Cash Collateral, the Debtors would be unable to satisfy employee compensation obligations, satisfy trade payables incurred in the ordinary course of business, preserve and maximize the value of their estates, and fund the administration of these chapter 11 cases, which would cause immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

83.    During these chapter 11 cases, the Debtors will generate cash from their operations and will need to use such cash to satisfy payroll obligations, continue satisfying obligations under their customer contracts, maintain insurance coverage, pay taxes, and make any other payments essential to the continued management, operation, and preservation of the Debtors' businesses.  The ability to satisfy these expenses as and when due is essential to the Debtors' continued operation of their businesses during the pendency of the chapter 11 cases.

Other than the Cash Collateral and loans or advances to the Debtors from the Loan Parties (other than API Americas, API Holdings, Cedar 2015 Limited, API Limited (as defined in the Credit Agreement) and the UK Guarantors (as defined in the Credit Agreement)) to the Debtors for the purpose of administering these chapter 11 cases ("Wind-Up Loan"), which the Debtors anticipate will serve as the basis for debtor-in-possession financing that the Debtors plan to pursue, the Debtors do not have access to funds sufficient to continue operation of their businesses.

84.      The Debtors and the Prepetition Secured Parties negotiated the proposed general terms of the Debtors' use of Cash Collateral in good faith and at arm's length, and such general terms (including the Administrative Agent's consent for Debtors' use of Cash Collateral) are set forth in the Fifth Amendment to Credit Agreement, which is attached to the Cash Collateral Motion as Exhibit B.  I believe that the terms on which the Prepetition Secured Parties ultimately agreed to permit the Debtors to use Cash Collateral are the most favorable terms the Debtors reasonably could have achieved under the circumstances.  Considering the overarching benefits of a negotiated and consensual cash collateral order, I believe that the Debtors should be authorized to use Cash Collateral on the terms described in the Cash Collateral Motion.

**I.    Motion for Approval of Continued Use of Cash Management System**

85.      Through the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Continued Use of* Existing *Cash Management System, Bank Accounts, and Business Forms and Payment of Related Prepetition Obligations; and (II)  Waiving Certain Deposit Requirements* ("Cash Management Motion"), the Debtors seek authority (i) to continue the use of their cash management system, including existing bank accounts and business forms; (ii) for banks to honor certain transfers and charge certain fees; (iii) to pay certain prepetition

28

obligations and (iv) to waive certain requirements of the U.S. Department of Justice, Office of the United States Trustee.

86.     The Cash Management System is comprised primarily of two (2) bank accounts, which are each maintained by KeyBank National Association ("KeyBank") and held by API Americas.  API Americas uses the bank account at KeyBank ending in 7983 to operate its foils business ("Foils Account") and uses the bank account at KeyBank ending in 7942 to operate its laminates business ("Laminates Account", together with the Foils Account, the "Bank Accounts").  Historically, transfers have been made between the two accounts to cover cash needs and intercompany settlements such as settlements relating to materials, wages, and maintenance.  Currently, the Debtors operate out of the Bank Accounts and will operate during the pendency of the case out of the Bank Accounts (in a manner consistent with prepetition operations).  The Cash Management System allows the Debtors to control the administration of these Bank Accounts.

87.     The Debtors also maintain an investment account at Prudential Financial Inc. ("Prudential") containing shares of common stock last valued at approximately $40,000.  This investment account is no longer actively used and, in fact, the Debtors are in the process of closing the account.

88.     Furthermore, the Debtors maintain a Paypal account to facilitate credit card purchases by customers. The balances are transferred to the Foils Account manually at the end of each day.

89.     The Debtors' personnel, located at the Debtors' headquarters, oversee all cash receipt and disbursement activity in the Cash Management System.   This centralization facilitates the Debtors' cash forecasting, monitoring of collections, approval of disbursement of

funds, preservation of capital, and management of liquidity requirements.  It also reduces administrative expenses by facilitating the movement of funds and development of more timely and accurate balance and presentment information.

90.     The Debtors receive all revenues and make all payments through their Cash Management System.  If the Debtors are unable to maintain their Cash Management System, the Debtors' operations will be severely impeded.  The Debtors, with the assistance of their advisors, have implemented protocols to ensure that only claims arising post-petition and certain claims arising prepetition (if payment of such prepetition claims is approved by this Court) will be paid by the Debtors.

91.     From time to time, and in the ordinary course of business, the Debtors incur obligations for the maintenance of the Cash Management System.  These obligations primarily consist of (a) amounts owed to KeyBank for the maintenance of and services related to the Bank Accounts ("Bank Fees"), together with other fees and obligations relating to the maintenance of the Cash Management System, the ("Cash Management Fees").    Bank Fees average approximately $3,000 per month.  The Debtors estimate that accrued, unpaid, and undisputed prepetition amounts outstanding as of the date hereof on account of the Cash Management Fees, including Bank Fees ("Cash Management Claims") total approximately $2,200 in the aggregate.

92.     The Debtors use various business forms, such as checks, invoices, letterhead, and other business and marketing materials in the ordinary course of their business ("Business Forms").  Because the Business Forms were used prepetition, they do not reference the Debtors' current status as a debtors-in-possession.  Requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estate.  Thus, the Debtors request that they be authorized to use their

existing Business Forms without placing a "Debtor-In-Possession" legend on each; provided, however, that after their existing Business Forms are depleted, the Debtors' Business Forms will identify the Debtors' status as debtors-in-possession.

93.     Based on the above, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' transition through chapter 11.

### J.    Motion to Pay Certain Prepetition Taxes

94.     By the Debtors' *Motion for Entry of Order (i) Authorizing the Payment of Certain Prepetition Taxes and Fees, and (ii) Granting Related Relief* (the "Tax Motion"), the Debtors will seek entry of an Order (a) authorizing, but not directing, the Debtors to remit and pay certain prepetition taxes and fees that will become payable during the pendency of these chapter 11 cases in the ordinary course of business; and (b) granting related relief.

95.     The Debtors collect, withhold, and incur sales, use, property, franchise, corporate, and other taxes, as well as other business and regulatory fees (collectively, the "Taxes and Fees").  The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities (collectively, the "Authorities").  A schedule identifying the Authorities is attached to the Tax Motion as Exhibit B.  Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions.  As of the Petition Date, the Debtors estimate they owe approximately $18,800 in Taxes and Fees relating to the prepetition period, none of which will become due and owing within the first twenty-one days following the Petition Date. The Debtors believe that the outstanding Taxes and Fees are comprised entirely of current tax obligations and are not in respect of "catch-up" payments.

96.     The Debtors pay the Taxes and Fees to the Authorities on a periodic basis, remitting them monthly, quarterly, or semiannually, depending on the nature and incurrence of the particular Tax or Fee.  Out of an abundance of caution, the Debtors seek authority pursuant to the Tax Motion to make such payments where: (a) Taxes and Fees accrue or are incurred post-petition; (b) Taxes and Fees accrued or were incurred prepetition but were not paid prepetition, or were paid in an amount less than actually owed; or (c) Taxes and Fees paid prepetition by the Debtors were lost or otherwise not received in full by any of the Authorities.

97.     Failing to pay the Taxes and Fees would materially disrupt the Debtors' business operations in several ways.  First, the Authorities could initiate audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from their restructuring process.  Second, failing to pay the Taxes and Fees could subject certain of the Debtors' directors and officers to claims of personal liability, which likely would distract those key employees from their duties related to the Debtors' restructuring.  Third, failing to pay certain of the Taxes and Fees likely would cause the Debtors to lose their ability to conduct business in certain jurisdictions.  Fourth, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively impact the Debtors' businesses.

98.     The Debtors incur, collect, and remit sales taxes to the Authorities in connection with the sale and distribution of their products.  Additionally, the Debtors purchase a variety of equipment, materials, and supplies necessary for the operation of their businesses from vendors who may not operate in the state where the property is to be delivered and, therefore, do not charge the Debtors sales tax in connection with such purchases.  In these cases, applicable law typically requires the Debtors to subsequently pay use taxes on such purchases to the applicable Authorities.  The Debtors generally remit sales and use taxes on a monthly basis.

99.     In 2019, the Debtors paid approximately $5,400 in sales and use taxes. As of the Petition Date, the Debtors estimate that they will owe approximately $800 to the relevant Authorities on account of prepetition sales and use taxes, approximately none of which will become due and owing during the first month of these chapter 11 cases.

100.     State and local laws in the jurisdictions in which the Debtors operate generally grant Authorities the power to levy property taxes against the Debtors' real and personal property.  In some instances, the Debtors lease property and pay property taxes to the landlords who then remit the property taxes to the applicable Authority.  To avoid the imposition of statutory liens on their real and personal property, the Debtors pay property taxes in the ordinary course of business on a quarterly or annual basis based on the jurisdiction.

101.     In 2019, the Debtors remitted approximately $164,000 in property taxes to the applicable Authorities.  This amount excludes property taxes paid through the Debtors' landlords, which is approximately $1,300 per month.  As of the Petition Date, the Debtors estimate that they owe approximately $17,500 to the relevant Authorities on account of property taxes, approximately none of which will become due and owing during the first month of these chapter 11 cases.

102.     Historically, in the ordinary course of operating their businesses, the Debtors have incurred corporate income taxes.  In 2019, the Debtors paid approximately $1,200 in corporate taxes to the applicable Authorities.  As of the Petition Date, the Debtors estimate that no amount of corporate tax is likely to be due to the relevant Authorities on account of prepetition income taxes.  However, out of an abundance of caution, the Debtors request the authority, but not direction, to pay any prepetition corporate taxes that come due after the Petition Date, and to pay in the ordinary course corporate taxes for 2020 as they become due.

36515706.1 02/02/2020

103.    The Debtors are responsible for franchise tax obligations that must be paid to state taxing authorities.  In 2019, the Debtors paid approximately $2,300 in franchise taxes. As of the Petition Date, the Debtors estimate that they have incurred or collected approximately $500 in franchise taxes that have not been remitted to the relevant Authorities, approximately none of which will become due and owing during the first month of these chapter 11 cases.

104.    The Debtors are currently not subject to any ongoing audit investigations. Although the Debtors do not expect any amounts to be incurred in connection with any future audits, in the event any future audits result in additional prepetition Taxes and Fees being assessed against the Debtors, out of an abundance of caution, the Debtors request authority in the Tax Motion to pay all Assessments should they come due in the ordinary course of business.

I have reviewed each of the First Day Pleadings, the facts stated therein and the descriptions of the relief they request. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the contents of the First Day Pleadings and the contents of the foregoing Declaration are true and correct to the best of my information and belief.

Dated: February 2, 2020

*/s/ Mitchell Gendel*_____
Mitchell Gendel
Chief Restructuring Officer

36515706.1 02/02/2020